## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| Mark Marshall,<br><br>    On behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>ConnectWise, Inc. and On Q Financial, LLC,<br><br>        Defendants. | Case No.: _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR A JURY TRIAL** |

## <u>CONSUMER CLASS ACTION COMPLAINT</u>

Plaintiff, Mark Marshall, individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Defendants On Q Financial, LLC ("On Q Financial") and ConnectWise, Inc. ("ConnectWise"), (collectively "Defendants"), based upon his personal knowledge and on information and belief derived from, among other things, investigation by Plaintiff's counsel as to all other matters:

1.      This case involves the unauthorized breach of On Q Financial's computer networks announced on February 20, 2023, wherein the personal identifiable information ("PII") of On Q Financial customers, including full names and Social Security numbers of about 20,000 individuals was exposed due to a

vulnerability in ConnectWise's software ScreenConnect, which allowed hackers and other bad actors to obtain individuals' PII for unsavory and illegal purposes (the "Data Breach").

2.      ConnectWise is an IT company providing software and services for businesses to run.[1]

3.      ConnectWise is a vendor for On Q Financial which is a mortgage lender specializing in mortgages for homeowners.[2] ConnectWise provided On Q Financial with a software product that allowed remote access to the On Q Financial network.

4.      As a mortgage lender, On Q Financial is responsible for processing loan payments, handling escrow accounts, and generally managing customers' mortgages. In order to obtain On Q Financial's services, customers are required to entrust On Q Financial with their PII, which On Q Financial uses in order to perform its regular mortgage lending activities. Upon information and belief, the PII customers entrust to On Q Financial is ultimately access in ConnectWise's information technology network.

5.      As IT service and mortgage lending companies, Defendants therefore knowingly collect and store sensitive customer PII, and have a resulting duty to secure such information from unauthorized access.

---

[1] https://www.connectwise.com/company/about-us (last visited April 12, 2024).

[2] *Id.*

6.     This Class Action Complaint is filed on behalf of all affected persons in the United States, described more fully in the following sections, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

8.     This Court has general personal jurisdiction over Defendant ConnectWise because it is citizen of the state of Florida.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant ConnectWise resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; Defendants conduct substantial business within this District; and Defendants have harmed Class Members residing in this District.

## PARTIES

10.    Plaintiff Mark Marshall is an adult individual and citizen of Georgia.

11.    Plaintiff Mark Marshall is an On Q Financial customer, and upon information and belief, provided his PII –including his name, address, and Social Security number—to Defendant as a condition of receiving mortgage services. His PII was then stored and maintained by ConnectWise.

3

12.     Plaintiff received a letter from On Q Financial notifying him of the Data Breach and of the unauthorized exposure of his PII.

13.     Plaintiff is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

14.     As a direct and proximate result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

15.     As a result of the Data Breach, Plaintiff has had to spend approximately 1 to 2 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

16.     As a result of the Data Breach, Plaintiff has spent considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

17.    Defendant On Q Financial, LLC is a limited liability company formed and existing under the laws of Arizona with its headquarters and principal place of business at 14275 N 87th Street Ste #210 Scottsdale, AZ 85260.

18.    Defendant ConnectWise, Inc. is a corporation formed and existing under the laws of Delaware with its headquarters and principal place of business 400 N Tampa Street, Suite 130, Tampa, Florida 33602.

## FACTUAL ALLEGATIONS

**A.    Defendants Provide Financial Services Involving Highly Sensitive Data.**

19.    On Q Financial provides mortgage servicing services to consumers.[3]

20.    ConnectWise provides IT software services to businesses and healthcare providers.

21.    In the course of providing its mortgage services, On Q Financial services hundreds of thousands of individuals nationwide.[4]

22.    In the course of providing IT software services to corporations, ConnectWise accesses and maintains the PII of hundreds of thousands of individuals nationwide.

---

[3] *About Us*, ON Q FINANCIAL, https://onqfinancial.com/about-2/ (last visited April 12, 2024); *Company Overview*; FIDELITY NATIONAL FINANCIAL, https://www.investor.fnf.com/ (last visited Mar. 5, 2024).

[4] https://www.jdsupra.com/legalnews/data-breach-at-on-q-financial-affects-3879104/ (last visited April 12, 2024).

23.     As part of conducting its mortgage services to customers, On Q Financial is entrusted with mortgage customers' sensitive PII, including but not limited to individuals' names, addresses, and Social Security Numbers.

24.     Upon information and belief, the PII On Q Financial is entrusted with is ultimately stored on ConnectWise's information technology network.

**B.     The Data Breach.**

25.     On or about March 29, 2024, Q Financial announced that it had been impacted by a "data security incident" after receiving notification from ConnectWise regarding a vulnerability in its product, ScreenConnect. [5]

26.     Defendants have provided minimal information about the Data Breach, describing the circumstances surrounding the Data Breach as follows:

> On February 20, 2024, On Q Financial Received a notification from ConnectWise, a software and IT management provider, regarding a vulnerability involving its product, ScreenConnect, which is a software program on Q Financial used for remote access to computers in our network. In response to the notification received from ConnectWise, we immediately patched and upgraded the application and began an investigation. The investigation revealed some suspicious activity through the ScreenConnect application. On Q Financial engaged a computer forensics investigation firm to conduct an independent investigation into what happened and determine whether personal information may have been accessed or acquired without authorization. Our investigation confirmed that the ConnectWise vulnerability has been successfully patched and the On Q Financial computer network is secure. However, on March 14, 2023, the investigation determined that the ConnectWise vulnerability permitted an unknown individual to access our computer network

---

[5] *Responding to ScreenConnect Vulnerability*, (March. 1, 2024), https://www.connectwise.com/blog/company-updates/responding-to-screenconnect-vulnerability

and the personal information of some of our clients was exfiltrated from our network.[6]

27.    Once able to access ConnectWise's systems, these malicious third-party hackers stole information including, *inter alia*, individuals' full names, addresses, and Social Security numbers.[7]

28.    As a result of the Data Breach, the PII of approximately 200,000 individuals—including Plaintiff and Class Members—was exfiltrated and is now in the hands of cybercriminals.[8]

29.    Omitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff or Class Members, who retain a vested interest in ensuring that their PII remains protected.

30.    Thus, Defendants' "disclosure" of the Data Breach amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[6] On Q Financial, Data Breach Notification Letter Dated March 29, 2024.

[7] Toulas, *supra* n.1.

[8] *Id.*

31.     In addition, Defendants do not make promises to customers about implementing additional safeguards and security to prevent future data breaches. Instead, Defendants place the onus on Plaintiff, merely instructing him to review "further steps you can take" and to call Defendants' listed number for any further questions.[9]

32.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

33.     The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members, including their names, dates of birth, and Social Security numbers. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

34.     Plaintiff further believes his PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiff experienced fraudulent misuse of their compromised information that would support this well-founded belief.

---

[9] *Id.*

C.      **Defendants Obtain, Collect, and Store Plaintiff's and Class Members' PII.**

35.     In the ordinary course of doing business with its customers, On Q Financial regularly requires Plaintiff and Class Members to provide On Q Financial their PII, which in turn is stored on ConnectWise's information technology network.

36.     Cybercriminals need not harvest every individual piece of information on a consumer from one data breach to commit identity fraud or misuse PII. They can cross-reference the data stolen from this Data Breach and combine it with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff and Class Members.

37.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from unauthorized access, compromise, and exfiltration.

38.     Defendants expressly recognize these duties, representing that they are "committed to protecting [customers'] privacy."[10]

39.     Plaintiff and Class Members reasonably expect that mortgage providers and IT software providers such as Defendants will use the utmost care to keep this information confidential and securely maintained, to use this

---

[10] https://onqfinancial.com/privacy-policy/; see also
https://www.connectwise.com/company/trust/privacy

information for business purposes only, and to make only authorized disclosures of this information.

40.     Plaintiff and Class Members had a reasonable expectation, based in part on Defendants' own statements, that their sensitive personal information would be protected. However, despite Defendants' stated commitment to data security, Defendants failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII and allowed for the release of said information to unauthorized bad actors.

41.     Had Defendants properly maintained their information technology network and worked diligently to correct vulnerabilities, remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants could have prevented intrusion into their information technology network and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

### D. The Value of PII and Effects of Unauthorized Disclosure

42.     Defendants were well-aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

43.     Defendants also knew that a breach of their computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

44.     These risks are not theoretical -- numerous high-profile breaches have occurred at financial services companies such as CapitalOne, KeyBank, Equifax, Flagstar Bank, and TMX Finance Corporate Services in recent years.

45.     PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[11] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

46.     Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

47.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[12]

---

[11] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft_(last accessed Mar. 5, 2024).

[12] *Data Breach Report: 2021 Year End*, RISK BASED SECURITY (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

48.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[13]

49.     The financial sector is also a prime target for threat actors. Between January 2018 and September 2023, financial companies have suffered 2,260 data breaches, impacting over 232 million records.[14]

50.     The financial sector is "disproportionately targeted by threat actors" because of a simple rational: "[t]hreat actors target organizations that have what they want and what pays big – data and money. Data can be sold for money and vulnerabilities that enable access to both data and money."[15]

51.     Indeed, "[h]acking financial organizations can potentially allow malicious threat actors to access accounts or personal information that can help a

---

[13] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

[14] Paul Bischoff, *Financial data breaches accounted for 232 million leaked records from January 2018 to September 2023*, Comparitech (Oct. 4, 2023), https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/#:~:text=2%2C260%20financial%20data%20breaches%20from,over%20101%20million%20in%20total.

[15] Jen Miller-Osborn, *3 Reasons Cyberattacks Target Financial Services and How to Fight Back*, PALOALTO NETWORK (Aug. 31, 2021), https://www.paloaltonetworks.com/blog/2021/08/financial-services-cyberattacks/.

criminal gain unauthorized access and make financial transactions or trick others into revealing more information and sending them money."[16]

52.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

53.     Unlike credit or debit card numbers in a payment card data breach— which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

54.     The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is

---

[16] Kyle Chin, *Why is the Finance Sector a Target for Cyber Attacks?*, UPGUARD (Aug. 21, 2023),                    https://www.upguard.com/blog/finance-sector-cyber-attacks#:~:text=Hacking%20financial%20organizations%20can%20potentially,information%20and%20sending%20them%20money.

> especially true if your other personal information, such as your name
> and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able
> to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new
> problems. If the old credit information is not associated with your new
> number, the absence of any credit history under the new number may
> make more difficult for you to get credit.[17]

55.   Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

56.   The ramifications of Defendants' failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

57.   A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained
> from misusing the victim's account or personal information, including
> the estimated value of goods, services, or cash obtained. It includes
> both out-of-pocket loss and any losses that were reimbursed to the
> victim. An indirect loss includes any other monetary cost caused by
> the identity theft, such as legal fees, bounced checks, and other

---

[17] Social Security Administration, *Identify Theft and Your Social Security Numbers*, (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[18]

58.    Even if stolen PII does not include financial or payment card account information does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

59.    A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[19]

---

[18] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Mar. 5, 2024).

[19] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

60.    Due to high-profile data breaches at other companies, Defendants knew or should have known that their information technology system would be targeted by cybercriminals.

61.    Defendants also knew or should have known the importance of safeguarding the PII with which they were entrusted and of the foreseeable consequences if its data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' PII from occurring.

### E. Defendants Failed to Comply with the FTCA and Failed to Observe Reasonable and Adequate Data Security Measures.

62.    The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[20]

63.    Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[21]

---

[20] *Start With Security*, FTC, https://www.ftc.gov/ system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

[21] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/ system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 5, 2024).

64.     The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

65.     The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

66.     The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

67.     FNF's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

68.     Plaintiff and Class Members gave their PII to Defendants with the reasonable expectation and understanding that Defendants would comply with its duty to keep such information confidential and secure from unauthorized access.

69.     Defendants have been on notice for years that Plaintiff's and Class Members' PII was a target for bad actors because of, among other motives, the high value of the PII created, collected, and maintained by Defendants.

70.     Despite such awareness, Defendants failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiff's and Class Members' PII from unauthorized access that Defendants should have anticipated and guarded against.

71.     ConnectWise was fully aware of its obligation to protect the PII of its customers because of its collection, storage, and maintenance of PII. ConnectWise was also aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information from millions of individuals and knew that this information, if hacked, would result in injury to Plaintiff and Class Members.

72.     On Q Financial was also fully aware of its obligation to protect the PII of its current and former customers because of its collection, storage, and maintenance of PII. On Q Financial was aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information from thousands of individuals and knew that this information, if hacked, would result in injury to Plaintiff and Class Members.

73.     Despite understanding the consequences of insufficient data security, Defendants failed to adequately protect Plaintiff's and Class Members' PII, permitting bad actors to access and misuse it.

**F. Defendants Failed to Comply with Industry Standards.**

74.     Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[22] All organizations collecting and handling PII, such as Defendants, are strongly encouraged to follow these controls.

75.     Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[23]

76.     Several best practices have been identified that a minimum should be implemented by data management companies like FNF, including but not limited

---

[22] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Mar. 5, 2024).

[23] *See* Center for Internet Security, *CIS Benchmarks FAQ*, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Mar. 5, 2024).

to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.

77.     Defendants failed to follow these and other industry standards to adequately protect the PII of Plaintiff and Class Members.

### G. The Data Breach Has Caused Harm and Will Result in Additional Fraud.

78.     Without detailed disclosure to the victims of the Data Breach, individuals whose PII was compromised by the Data Breach, including Plaintiff and Class Members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their PII for months without being able to take available precautions to prevent imminent harm.

79.     The ramifications of ConnectWise's failure to secure Plaintiff's and Class Members' data are severe.

80.     Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

81.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC

---

[24] 17 C.F.R § 248.201 (2013).

describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[25]

82.    Identity thieves can use PII, such as that of Plaintiff and Class Members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

83.    As demonstrated herein, these and other instances of fraudulent misuse of the compromised PII has already occurred and are likely to continue.

84.    As a result of ConnectWise's delay between the Data Breach in February and the notice of the Data Breach sent to affected persons in March, the risk of fraud for Plaintiff and Class Members increased exponentially.

85.    Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[26]

86.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit.

---

[25] *Id.*

[26] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited Mar. 5, 2024).

After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[27]

87.    There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

88.    Thus, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

## H. Defendants are Subject to, and Failed to Comply with, the GLBA.

89.    The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

---

[27]    Bureau of Justice Statistics, *Victims of Identity Theft* (Sept. 2015), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Mar. 5, 2024).

[28]    GAO, *Report to Congressional Requesters*, at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Mar. 5, 2024).

90.     A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). Defendants are considered financial institutions for purposes of the GLBA as Defendants offer consumers financial products and/or services loans.[29] *See* 12 U.S.C. § 1843(k)(4).

91.     "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

92.     Defendants collect "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendants were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and are subject to numerous rules and regulations promulgated under the GLBA.

93.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security,

---

[29] Defendants acknowledge that they are subject to the GLBA. *See* Fidelity National Financial, *Code of Business Conduct & Ethics* (Feb. 2023), https://www.investor.fnf.com/static-files/0a78d41c-b0d8-4fc6-847a-dab5340915ac, at 9 (acknowledging "[t]he Safeguards Rule, implemented as part of the Gramm-Leach-Bliley Act, and other federal and state laws and regulations provide specific guidelines regarding the privacy, protection and security of customers' personally identifiable information").

confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more customers to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, Defendants violated the Safeguards Rule.

94.     Defendants' conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendants failed to implement (or inadequately implemented) information security policies or procedures such as effective customer training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to

protect the confidentiality of the PII they maintained in their information technology network.

95.    Had Defendants implemented data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

### I.   Plaintiff and Class Members Suffered Damages.

96.    The Data Breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including ConnectWise's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

97.    Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they would have prevented intrusion into its information storage and security systems and, ultimately, the theft of the PII of over 200,000 individuals.

98.    As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have already

been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

99.    Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

   a.  theft and misuse of their personal and financial information;

   b.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused via the sale of Plaintiff's and Class Members' information on the Internet's black market;

   c.  the untimely and inadequate notification of the Data Breach;

   d.  the improper disclosure of their PII;

e.  loss of privacy;

f.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.  ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market; and,

h.  the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

100.  Also of significant concern to Plaintiff, Defendants continue to possess Plaintiff's and Class Members' PII. Particularly because Defendants have demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiff and Class Members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this class action individually on behalf of himself and on behalf of all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seek certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Class:

### Nationwide Class

All persons residing in the United States whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

102.    Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

103.    Plaintiff reserves the right to modify or amend the foregoing class definitions before the Court determines whether certification is appropriate.

104.    Numerosity: The members in the Class is so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that approximately 200,000 individuals' information was exposed in the Data Breach.

105.    Commonality and Predominance: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

c.    Whether Defendants' computer systems and data security practices used to protect Plaintiff's and Class Members' PII violated the FTCA and/or the GLBA and/or state laws, and/or Defendants' other duties discussed herein;

d.    Whether FNF failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e.    Whether Defendants unlawfully shared, lost, or disclosed Plaintiff's and Class Members' PII;

f.    Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h.     Whether Plaintiff and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i.      Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

j.      Whether Defendants breached duties to protect Plaintiff's and Class Members' PII;

k.     Whether Defendants' actions and inactions alleged herein were negligent;

l.      Whether Defendants were unjustly enriched by their conduct as alleged herein;

m.    Whether an implied contract existed between Class Members and Defendants with respect to protecting PII and privacy, and whether that contract was breached;

n.     Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o.     Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p.     Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

106. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

107. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed Class Members, had his PII compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

108. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class and have no interests adverse to, or conflict with, the Class they seek to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

109. <u>Superiority</u>: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful

conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

110.   <u>Injunctive and Declaratory Relief:</u> Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

111.   All members of the proposed Class are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a breach notice letter.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

112.   Plaintiff restates and realleges paragraphs 1 through 111 above as if fully set forth herein.

113.   Defendants require their customers to provide their non-public PII as a condition of obtaining loan subservicing.

114. Defendants gathered and stored the PII of Plaintiff and Class Members as part of its business, which affects commerce.

115. Plaintiff and Class Members entrusted Defendants with their PII with the understanding that the information would be safeguarded.

116. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if their PII were wrongfully disclosed.

117. By assuming the responsibility to collect and store this data, Defendants had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

118. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

119. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII they were no longer required to retain pursuant to regulations.

120. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach, but failed to do so.

121. Defendants had and continues to have duties to adequately disclose that Plaintiff's and Class Members' PII within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that

were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

122.     Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

   b.  Failing to adequately monitor the security of their networks and systems;

   c.  Allowing unauthorized access to Class Members' PII;

   d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

   e.  Failing to remove former customers' PII they were no longer required to retain pursuant to regulations; and

   f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

123.     A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

124.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of corporate cyberattacks and data breaches.

125.   Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

126.   Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on their systems.

127.   It was foreseeable that Defendants' failure to adequately safeguard PII would result in one or more types of injuries to Class Members.

128.   Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

129.   Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

130.   Defendant's duties extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the

risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

131.    Defendants have admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

132.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, Plaintiff's and Class Members' PII would not have been compromised.

133.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiff's and Class Members' PII, and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. PII was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

134.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted

and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

135.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

136.   Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

137.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT II
## NEGLIGENCE *PER SE*
## (On Behalf of Plaintiff and the Class)

138.   Plaintiff restates and realleges paragraphs 1 through 137 above as if fully set forth herein.

139.   Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45 which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

140.   Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiff and Class Members.

141.   Plaintiff and Class Members were within the class of persons the provisions of the FTCA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statutes were intended to guard against.

142.   Defendants' violations of Section 5 of the FTCA constitute negligence *per se*.

143.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid

unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

144.   In addition, Defendants collect "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendants were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and are subject to numerous rules and regulations promulgated under the GLBA.

145.   Defendants' conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendants failed to implement (or inadequately implemented) information security policies or procedures such as effective customer training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII they maintained in their information technology network.

146.   It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations and financial institutions.

147.   Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII was wrongfully disclosed.

148.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

149.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

150.    But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

151.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and

continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

152.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

**COUNT III**
**BREACH OF IMPLIED CONTRACT AND**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Class)**

153.    Plaintiff restates and realleges paragraphs 1 through 152 above as if fully set forth herein.

154.    Plaintiff and Class Members were required to provide their PII to Defendants as a condition of receiving loan subservicing.

155.    Plaintiff and Class Members entrusted their PII to Defendants. In doing so, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

156.    In entering into the implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices

complied with relevant laws and regulations and were consistent with industry standards.

157.   Implicit in the agreement between Plaintiff and Class Members and Defendants was Defendants' obligation to: (a) take reasonable steps to safeguard that PII; (b) prevent unauthorized disclosure of the PII; (c) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (d) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain PII only under conditions that kept such information secure and confidential.

158.   The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants on the other, is demonstrated by their conduct and course of dealing. Defendants required Plaintiff and Class Members to provide their PII as a condition of mortgage loan subservicing. Plaintiff and Class Members accepted the offers for services and provided their PII.

159.   In accepting Plaintiff's and Class Members' PII, Defendants understood and agreed that they were required to reasonably safeguard and otherwise ensure protection of the PII from unauthorized access or disclosure.

160.   Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants that Defendants would keep their PII reasonably secure.

161.   Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor and ensure that the PII entrusted to it would remain protected by reasonable data security measures and remain confidential.

162.   Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants by providing their PII at Defendants' request.

163.   Defendants breached the implied contracts made with Plaintiff and Class Members by failing to safeguard and protect their PII, by failing to delete the PII of Plaintiff and Class Members once the relationship ended, and by failing to provide accurate notice to them that their PII was compromised as a result of the Data Breach.

164.   As a direct and proximate result of Defendants' breach of these implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

165.   Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

166.   As alleged herein, when Plaintiff and Class Members provided their PII to Defendants, they entered into implied contracts where Defendants agreed to comply with its duties and industry standards to protect PII and to timely detect and notify them in the event of a data breach.

167.    Plaintiff and Class Members were required to provide their PII in exchange for mortgage loan subservicing with Defendants, as well as an implied covenant by Defendants to protect Plaintiff's PII in its possession.

168.    It was clear by these exchanges that Plaintiff and Class Members on one hand, and Defendants on the other, intended to enter into an agreement. Plaintiff and Class Members would not have disclosed their PII to Defendants but in exchange for Defendants' loan servicing. Conversely, Defendants presumably would not have collected Plaintiff's and Class Members' PII if they did not intend to provide Plaintiff and Class Members with the services they were offering.

169.    Implied in these exchanges was a promise by Defendants to ensure that PII of Plaintiff and Class Members was only used in connection with the agreed-upon services.

170.    Plaintiff and Class Members therefore did not receive the benefit of the bargain with Defendants, because they provided their PII in exchange for an implied agreement by Defendants to keep it safe and secure.

171.    While Defendants had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

172.    Defendants breached this implied covenant when they engaged in acts and/or omissions that are declared unfair trade practices by the FTCA, the GLBA, and state statutes and regulations. These acts and omissions included: omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and

security protections for Plaintiff's and Class Members' PII; storing the PII of former customers, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiff and Class Members at the time they provided their PII to it that Defendants' security systems failed to meet applicable legal and industry standards.

173.   Plaintiff and Class Members did all or substantially all the significant things that the contract required them to do. Likewise, all conditions required for Defendants' performance were met.

174.   Defendants' acts and omissions unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

175.   Plaintiff and Class Members have been or will be harmed by Defendants' breach of this implied covenant in the numerous ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cybercriminals have their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

176.   Defendants are liable for its breach of these implied covenants, whether or not they are found to have breached any specific express contractual term.

177.   Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

178.   Plaintiff restates and realleges paragraphs 1 through 177 above as if fully set forth herein.

179.   Plaintiff and Class Members conferred a monetary benefit on Defendants by providing them with their valuable PII.

180.   Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from Plaintiff's retained data and use Plaintiff's and Class Members' PII for business purposes.

181.   Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

182.   Defendants acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

183.   If Plaintiff and Class Members had known Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendants.

184.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

185.   As a direct an proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

186.   Plaintiff and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful

conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

187.   Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

188.   Plaintiff restates and realleges paragraphs 1 through 187 above as if fully set forth herein.

189.   Defendants became the guardian of Plaintiff's and Class Members' PII. Defendants became fiduciaries, created by its undertaking and guardianship of Plaintiff's and Class Members' PII, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiff's and Class Members' PII and to timely detect and notify Plaintiff and Class Members in the event of a data breach.

190.   Defendants knowingly undertook the responsibility and duties related to the possession of Plaintiff's and Class Members' PII for the benefit of Plaintiff and Class Members in order to provide Plaintiff and Class Members loan subservicing.

191.   Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members within the scope of its relationship with them. Defendants

breached their fiduciary duties owed to Plaintiff and Class Members by failing to properly protect PII. Defendants further breached their fiduciary duties by failing to timely detect the Data Breach and notify and/or warn Plaintiff and Class Members of the Data Breach.

192.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as it fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII in its continued possession; (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (h) nominal damages.

193.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VI**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 *et seq*.**
**(On Behalf of Plaintiff and the Class)**

194.   Plaintiff restates and realleges paragraphs 1 through 193 above as if fully set forth herein.

195.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Consolidated Class Action Complaint.

196.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiff continue to suffer injuries as result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

197.   Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Defendants owe a legal duty to secure Plaintiff's and Class Members' PII under the common law, the FTCA, the GBLA, and other state and federal laws and regulations, as set forth herein;

b.   Defendants' existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' PII; and

c.   Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class Members' PII.

198.   This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect members' PII, including the following:

a.   Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.   Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i.   prohibiting Defendants from engaging in the wrongful and unlawful acts alleged herein;

ii.    requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendants to delete and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

v.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi.    prohibiting Defendants from maintaining Plaintiff's and Class Members' PII on a cloud-based database until proper safeguards and processes are implemented;

vii.    requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendant's

network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.   requiring Defendants to conduct regular database scanning and securing checks;

ix.   requiring Defendants to monitor ingress and egress of all network traffic;

x.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

xi.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii.   requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external

threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.   requiring Defendants to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

199.   If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

200.   The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. The cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal duty to employ such measures.

201.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendants' systems and network, thus preventing future injury to Plaintiff and other members whose PII would be further compromised.

202. Following the issuance of the declaratory relief requested herein, Plaintiff and Class Members will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendants.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other Class Members, respectfully request that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and Class Members, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

### JURY TRIAL DEMANDED

Plaintiff demand a trial by jury of all claims in this Consolidated Class Action Complaint so triable.

Dated: April 12, 2024.                    Respectfully submitted,

*/s/ Mariya Weekes*
Mariya Weekes FBN 56299
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel: (786) 879-8200
mweekes@milberg.com

Christopher Renz (*pro hac vice*
forthcoming)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave. S, Suite 1700
Minneapolis, MN 55401
Tel: (612) 339-7300
crenz@chestnutcambronne.com

*Counsel for Plaintiff and the Putative Class*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via email via the CM/ECF system on all counsel of record on this 12th day of April, 2024.

*/s/ Mariya Weekes*
Mariya Weekes